No. 12-5158

# United States Court of Appeals
### *for the*
# District of Columbia Circuit

PUBLIC EMPLOYEES FOR
ENVIRONMENTAL RESPONSIBILITY

Appellant

v.

UNITED STATES SECTION, INTERNATIONAL
BOUNDARY AND WATER COMMISSION,
U.S. –MEXICO

Appellee

*Appeal from the United States District Court for the
District of Columbia*

## BRIEF OF APPELLANT, PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY

Paula Dinerstein
Public Employees for Environmental
Responsibility
2000 P Street, NW, Suite 240
Washington, D.C.  20036-6924
(202) 265-7337

January 22, 2013

## APPELLANT'S CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

I.     The Parties

The Appellant is Public Employees for Environmental Responsibility ("PEER"), the plaintiff in District Court. The Appellee is the United States Section, International Boundary and Water Commission, U.S. –Mexico, the defendant in District Court.  There were no Amici or Intervenors.

II.    Rulings Under Review

This appeal is regarding the March 21, 2012 Order granting the Defendant's Motion for Summary Judgment, denying the plaintiff's Cross Motion for Summary Judgment, and entering Judgment for the defendant.

III.   Related Cases

This case has not been previously before this Court, and there are no pending related cases of which counsel is aware.


Respectfully submitted,

/s/ Paula Dinerstein
Paula Dinerstein
Public Employees for Environmental Responsibility
2000 P Street, NW, Suite 240
Washington, D.C. 20036-6924
Tel.: (202) 265.7337
Fax: (202) 265.4192
Email: pdinerstein@peer.org

# TABLE OF CONTENTS

Appellant's Certificate as to Parties, Rulings and Related Cases

Table of Contents …………………………………………………………   i

Table of Authorities ………………………………………………………  iii

Glossary of Abbreviations ……………………………………………….vii

Jurisdictional Statement ………………………………………………….1

Statement of Issues ……………………………………………………….1

Statement of the Case …………………………………………………… 3

Statement of Facts ……………………………………………………….. 4

Summary of Argument …………………………………………………..  8

Argument …………………………………………………………………. 10

     I.     STANDARD OF REVIEW ………………………………… 10

     II.    THE AGENCY'S DECLARATIONS CANNOT SUPPORT SUMMARY JUDGMENT BECAUSE THERE IS EVIDENCE OF BAD FAITH. …………………………….. ………… 10

     III.   THE AGENCY HAS NOT MET ITS BURDEN TO JUSTIFY ITS WITHHOLDINGS PURSUANT TO EXEMPTIONS 5, 7(E) AND 7(F)……………………………………………… 16

          A. Exemption 7 …………………………………………..  16

              1.  The Agency Fails to Meet the Threshold Requirement of Exemption 7 ……………………………………  17

              2.  Exemption 7(E) Does Not Apply Here ……………… 28

              3.  Exemption 7(F) Does Not Apply Here ……………… 30

B. Exemption 5 Is Not Met Because the Expert Report Is Not Intra- or Inter-Agency or Deliberative ………………… 32

   1. The Expert Report Is Neither Inter-agency nor Intra-agency …………………………………………… 32

   2. The Expert Report Is Not Deliberative ……………… 34

C. The Agency Failed to Segregate Non-Exempt Material …36

Conclusion ………………………………………………………… 40

Statutory Addendum – the Freedom of Information Act

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

**Court Cases*** **Page**

*Abdelfattah v. U.S. Dep't of Homeland Sec.*, 488 F.3d 178
(3d Cir. 2007) …………………………………………………….. 18

*Allen v. CIA*, 636 F.2d 1287 (D.C. Cir. 1980) ………………………….. 11

***Am. Civil Liberties Union v. Dept. of Defense*, 543 F.3d 59
(2nd Cir. 2008), *vacated and remanded on other grounds,*
130 S. Ct. 779 (2007) …………………………………………… .. 21, 30

*Am. Soc. of Pension Actuaries v. IRS*, 746 F. Supp. 188 (D.D.C. 1990) … 36

*Army Times Pub. Co. v. Dep't of Air Force*, 998 F.2d 1067
(D.C. Cir.1993)  …………………………………………………… . 37

*Blackwell v. FBI*, 646 F.3d 37 (D.C. Cir. 2011) ………………………….. 30

*Campbell v. Dep't of Justice*, 164 F.3d 20 (D.C. Cir. 1998) …………. 11, 18

*Carter, Fullerton & Hayes, LLC v. FTC*, 520 F. Supp. 2d 134
(D.D.C. 2007) …………………………………………………… 38

*Ctr. for Nat'l Sec. Studies v. Dep't of Justice,* 331 F.3d 918, 925 (D.C.
Cir. 2003) …………………………………………………………… 10

***Church of Scientology of Calif. v. U.S. Dep't of the Army*, 611 F.2d 738
(9th Cir. 1979) ……………………………………………………17, 19

***Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866
(D.C. Cir. 1980) ………………………………………….......... 34, 35

*Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) …………………………. 16

***Dep't of the Interior. v. Klamath Waters Users Protective Ass'n,*
532 U.S. 1(2001) …………………………………………………… 33

*Authorities principally relied upon are denoted by an asterisk.

iii

*EPA v. Mink*, 410 U.S. 73 (1973)…………………………………………… 35

*Families for Freedom v. U.S. Customs & Border Prot.*, 797 F. Supp. 2d 375  (S.D.N.Y.  2011) …………………………………………………… 29

*Jefferson v. Dep't of Justice*, 284 F.3d 172 (D.C. Cir. 2002) …………… 18

*Johnson v. Exec. Office for United States Attys.*, 310 F.3d 771 (D.C. Cir. 2002) ……………………………………………………………………… 39

*King v. Dep't of Justice*, 830 F.2d 210 (D.C. Cir. 1987) …………………..11

*Krikorian v. Dep't of State*, 984 F.2d 461 (D.C. Cir. 1993) …………... 36-37

*Living Rivers, Inc. v. Bureau of Reclamation*, 272 F. Supp. 2d 1313 (D. Utah 2003) …………………………………………………………21, 30

*Mayer Brown LLP v. IRS*, 562 F.3d 1190 (D.C. Cir. 2009) ……………… 30

* *McGehee v. CIA*, 697 F.2d 1095 (D.C. Cir. 1983) ……………………..  11

*McGehee v. U. S. Dep't of Justice*, 800 F. Supp. 2d 220 (D.D.C. 2011) ….37

*Mead Data Central v. Dep't of Air Force*, 566 F.2d 242 (D.C. Cir. 1977)  ………………………………………………… 34, 36, 37

*Milner v. Dep't of Navy*, ____ U.S. ____, 131 S. Ct. 1259 (2011) ……6, 22

*Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007) ……………………… 11, 39

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975) …………………35-36

*Tax Analysts v. IRS*, 294 F.3d 71 (D.C. Cir. 2002) ……………………… 18

*U.S. v. 8 Gilcrease Lane, Quincy Fla. 32351*, 587 F. Supp. 2d 133 (D.D.C. 2008) ……………………………………………………………… 16

*Vaughn v. Rosen*, 523 F.2d 1136 (D.C. Cir. 1975) ……………………….  34

*Williams & Connolly v. SEC*, 662 F.3d 1240, 1243 (D.C. Cir. 2011) …… 32

iv

## Statutory Provisions

5  U.S.C. § 552 …………………………………………………………  3

5 U.S.C. § 552(a)(4)(B) ………………………………………….. 1, 10

5 U.S.C. §552(b)……………………………………………………. 36

5 U.S.C. § 552(b)(5) ………………………………………………. 32

5 U.S.C. § 552(b)(7) ……………………………………………… 17

5 U.S.C. § 552(b)(7)(E) ………………………………………… 28

5 U.S.C. § 552(b)(7)(F) ………………………………………….. 30

28 U.S.C. § 1746 …………………………………………………..16

43 U.S.C. 373b(a)………………………………………………… 21

California Government Code Section 8589.5(b) ………………………… 27

## Regulatory Provisions

Fed.R.Civ.P. 56(c)(4)  …………………………………………… 15

## Web Addresses

http://gisweb.apsu.edu/WolfCreek.html …………………………………… 26

http://riogrande.org/2010/07/19/alex-update-on-need-for-trims/ ………… 27

http://www.fema.gov/library/viewRecord.do?fromSearch=fromsearch&id=4
612 ……………………………………………………………………… 24

http://www.ibwc.gov/Mission_Operations/SoD_Amistad.html ...........12, 36

http://www.ibwc.state.gov/Files/FOIA _Annual_Report_FY11.pdf ….. 8, 14

http://www.ibwc.state.gov/Files/SOD_Report_Amistad.pdf ……………. 35

http://www.lrn.usace.army.mil/WolfCreek/maps_online.htm …………… 26

http://www.themonitor.com/articles/texas-48642-rangers-
drug.html?db=monitortx&id=39450……………………………………….. 23

http://www.turnto23.com/news/15824853/detail.html …………………….. 27

http://www.water.ca.gov/orovillerelicensing/docs/wg_study_reports_and_do
cs/EO/SP-E4%20App%20B.pdf ……………………………………… 27

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| Department of Homeland Security | DHS |
| Federal Emergency Management Agency | FEMA |
| Freedom of Information Act | FOIA |
| Internal Revenue Service | IRS |
| Joint Appendix | JA |
| Public Employees for Environmental Responsibility | PEER |
| United States Section, International Boundary and Water Commission, U.S. –Mexico | USIBWC |

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this Freedom of Information Act case under 5 U.S.C. § 552(a)(4)(B). This Court's jurisdiction is founded upon 28 U.S.C. § 1291. This is an appeal from the final order and judgment of the U.S. District Court for the District of Columbia dated March 21, 2012, which disposed of all of Appellant's claims. The District Court's decision is reported as *Pub. Employees for Envtl. Responsibility v. U. S. Section, Int'l Boundary and Water Comm'n, U.S. –Mex.,* 839 F. Supp. 2d 304 (D.D.C. 2012). This appeal was timely filed on May 17, 2012.

## STATEMENT OF ISSUES

1. Was summary judgment based upon Agency Declarations inappropriate because of the Agency's bad faith in processing the FOIA request, as evidenced by a) denial of the existence of a document known to the FOIA Office to exist, b) unexplained failure to locate numerous documents in the initial search, and c) withholding of documents which the Agency had previously agreed to make public; and because of bad faith evidenced by misrepresentations in the Agency's Declarations and court filings in this case, including a) the claim in a court filing that the Agency has no FOIA Office, b) the claim in an Agency Declaration that

that there was a terrorist threat against a dam when that threat was known to be a rumor or hoax, c) reliance in court filings on the fictional threat to claim national security implications for release of the documents and potential "massive downstream casualties," despite an Agency statement to the press that dam failure would not cause serious harm, and d) attribution of authorship of the document withheld under Exemption 5 to U.S. federal agencies when in fact a Mexican government agency was also an author?

2. Was the Agency justified in withholding documents under FOIA Exemptions 7(E) and 7(F) where the Agency has no law enforcement functions, as required to meet the threshold requirement of Exemption 7; where the withheld documents do not disclose techniques, procedures or guidelines for law enforcement investigations or prosecutions, or thereby risk circumvention of the law, as required by Exemption 7(E); and where it has not been shown that release of the withheld documents could reasonably be expected to endanger the life or physical safety of any individual, as required by Exemption (7)(F)?

2

3.  Was the Agency justified in withholding a document under FOIA

Exemption 5 where the document was authored by non-agency

employees, including employees of an agency of a foreign

government with its own interests distinct from that of the

Agency; where the document likely contained largely factual

material; and where the Agency did not present evidence as to

how large parts of the document informed any deliberative

process, or that the document made recommendations or

expressed opinions on legal or policy matters, or what specific

harm to the decision-making process would result from

disclosure?

4.  Where numerous entire documents and large portions of other

documents were withheld based on conclusory assertions that all

reasonably segregable portions were disclosed, did the Agency

discharge its burden of showing that the requested documents

could not be further segregated?

## STATEMENT OF THE CASE

By letter dated August 10, 2010, Appellant Public Employees for

Environmental Responsibility (PEER) submitted a request pursuant to the

Freedom of Information Act ( FOIA), 5  U.S.C. § 552, to Appellee United

States Section, International Boundary and Water Commission, U.S.-Mexico ("the Agency"), pertaining to safety issues and emergency response plans concerning the Agency's dams on the Rio Grande.  JA 43-45.[1]

On September 28, 2010, the Agency responded to PEER's FOIA request, producing some documents, claiming to be unable to locate some documents, and withholding others under claimed exemptions.  JA 46-47. PEER filed an administrative appeal on October 15, 2010.  JA 48-52.  On November 29, 2010, the Agency partially denied PEER's appeal.  JA 53-54. On January 31, 2011, PEER filed this lawsuit to compel the Agency to disclose the withheld records.  The parties filed cross-motions for summary judgment.  On March 21, 2012, the U.S. District Court for the District of Columbia issued a final decision granting the Agency's motion for summary judgment and denying PEER's motion for Summary Judgment.  This appeal followed.

## STATEMENT OF FACTS

PEER's FOIA request sought the following documents, among others:

(1) A copy of the November 2009 report issued by a panel of technical advisers regarding the condition of Amistad Dam and plan of action; and

(2) Current inundation maps and Emergency Action Plans for areas downstream of Falcon Dam and Amistad Dam.

---

[1] "JA" refers to the Joint Appendix filed with this brief.

4

J.A. 43, nos. 1 and 3.

The Agency's September 28, 2010 response to PEER's FOIA request claimed with respect to (1) that it was unable to locate the "November 2009" report referenced in the request. With respect to (2), the Agency stated that it located two responsive documents but withheld both pursuant to FOIA Exemption 5 as drafts protected by the deliberative process privilege. JA 46, nos. 1 and 3.

PEER's October 15, 2010 administrative appeal alleged that the Agency was not being truthful about the existence of the November 2009 report. PEER cited and quoted an August 8, 2010 article from a local newspaper, the *Brownsville Herald,* stating that the newspaper had requested a copy of a "November 2009" report issued by a panel of technical advisors regarding the condition of the Amistad Dam, but that the Agency had refused to release it, citing FOIA Exemption 5. JA 49-50. With respect to (2), PEER objected to the Agency's failure to explain why Exemption 5 would apply to inundation maps or Emergency Action Plans. JA 50.

On November 29, 2010, the USIBWC partially denied PEER's appeal. JA 53-54. The Agency explained that, aided by PEER's reference to the *Brownsville Herald* article, the Agency realized, for the first time, that PEER's description of a "November 2009" report pertained to a report dated

5

October 2009, the "Joint Expert Panel Review of the Foundation, Embankment and Concrete Structure for Amistad Dam" (hereinafter "Expert Report"). JA 76. The Agency invoked Exemption 2 to withhold the Expert Report, claiming that disclosure "could facilitate illegal acts against critical infrastructure." JA 53.

With respect to (2), the Agency stated that upon repeating its search, it located, for the first time, a binder containing 77 drafts of inundation maps. The Agency however withheld all of them pursuant to Exemptions 2 (claiming that disclosure could facilitate illegal acts against critical infrastructure), and 5 (claiming that the documents were pre-decisional, deliberative process documents). JA 54. The Agency released two Emergency Action Plans in heavily redacted form, claiming for the redactions Exemptions 2 (on the basis that disclosure could facilitate illegal acts against critical infrastructure) and Exemption 6 (claiming that the information constituted private contact information). *Id.*

After PEER filed this lawsuit, the Supreme Court decided *Milner v. Dep't of Navy*, ____ U.S. ____, 131 S. Ct. 1259 (2011), which limited the use of Exemption 2. The Agency subsequently withdrew its reliance on Exemption 2 for any of its withholdings, but did not release any additional material. It relied for its withholdings upon Exemptions 5, 7(E) and 7(F).

Specifically, the Agency relied on Exemption 5 to withhold the Expert

Report, Exemptions 7(E) and 7(F) to withhold the Emergency Action Plans

and Exemption 7(F) to withhold the inundation maps.  JA 76. [2]

      In response to PEER's claim that the Agency's FOIA office had made

a false claim that the Expert Report did not exist, the Agency claimed that its

"Safety Dams Section" had responded to the FOIA request, and that that

office was unaware of a reference to the November 2009 Report on the

Agency's website.  JA 71, ¶7.  In response, PEER argued that in fact it was

the agency's FOIA office -- the same office that had denied a request from

the *Brownsville Herald* for the same report under Exemption 5 days earlier -

- that had claimed the document did not exist.  JA 94.  The Agency

responded that although a FOIA officer and Chief FOIA Officer signed the

letters to PEER, in fact the Agency did not have a FOIA office.  JA 102.

PEER responded by citing to the Agency's website, where the "Chief FOIA

---

[2] The Agency also relied on Exemption 6 to withhold contact information for
emergency officials in the Emergency Action Plans.  *Id.*   PEER does not
challenge that part of the withholding in this appeal.  Before the District
Court, the Agency also withdrew its reliance on Exemption 5 for
withholding the inundation maps and relied solely on Exemption 7.  *Id.*

Officer Report 2011" repeatedly refers to the Agency's FOIA Office and its personnel.[3]

## SUMMARY OF ARGUMENT

The Agency's Declarations were offered in bad faith and therefore cannot support summary judgment. The Agency's disingenuous claim that it did not know which documents PEER sought, its egregiously false claim that it does not even have a FOIA office, and misstatements in the Declarations and briefing filed with the District Court, as well as its contemporaneous "blowing off" of PEER's FOIA requests in another case, provide cumulative evidence of bad faith that strips the Agency's Declarations of all trustworthiness.

The District Court erred in finding that the Agency properly withheld documents pursuant to 7(E) and 7(F). As a threshold requirement under Exemption 7, an agency must establish that the records were compiled for law enforcement purposes, which in turn requires that the Agency first demonstrate that it has law enforcement functions. The Agency did not, and could not possibly do so here, because it has no law enforcement functions. The threshold requirement cannot be met, as the Agency claims, by a vague

---

[3] JA 164, citing
http://www.ibwc.state.gov/Files/FOIA_Annual_Report_FY11.pdf

claim of "national security," or a tenuous link to entirely separate agencies which do have law enforcement responsibility.

The Agency's withholdings fail to meet the threshold requirement of Exemption 7 and also the additional requirement for a showing of an enumerated harm.   The Agency failed to meet it burden to support its withholding of portions of the Emergency Action Plans pursuant to Exemption 7(E), because the withheld materials do not involve "law enforcement investigations or prosecutions," and in addition, the Agency did not show how release of the documents would "risk circumvention of the law."  The Agency also failed to meet its burden to support its invocation of Exemption 7(F) to withhold all of the inundation maps and parts of the Emergency Action Plans, because the Agency failed to identify "any individual" whose life or safety would be endangered by release.

The Agency also failed to meet its burden to justify its withholding of the Expert Report pursuant to Exemption 5, because it is not inter-agency or intra-agency, having been written by a group that included members representing the interests of a foreign government.  Further, it is not deliberative, since it is likely largely factual, and there was no showing that it made recommendations or expressed opinions on legal or policy matters, or that its disclosure could harm any decision-making process.

9

Lastly, the District Court erroneously excused the Agency's failure to segregate non-exempt material, relying on a completely insufficient generic declaration that segregation was not feasible.

## ARGUMENT

### I.    STANDARD OF REVIEW

In an action under FOIA, the District Court's grant of summary judgment is reviewed *de novo*.  This Court "therefore consider[s] anew each of the claims and defenses advanced before the district court."  *Ctr. for Nat'l Sec. Studies v. Dep't of Justice,* 331 F.3d 918, 925 (D.C. Cir. 2003).  Therefore, the standard of review for all of the issues raised herein is *de novo*.  When records are withheld from the requester, the burden is on the agency to sustain its action.  5 U.S.C. § 552(a)(4)(B).

### II.    THE AGENCY'S DECLARATIONS CANNOT SUPPORT SUMMARY JUDGMENT BECAUSE THERE IS EVIDENCE OF BAD FAITH.

Summary judgment in a FOIA case may be based on agency affidavits only where:

> (1) the agency affidavits describe the documents withheld and the justifications for nondisclosure in enough detail and with sufficient specificity to demonstrate that material withheld is logically within the domain of the exemption claimed, and (2) the affidavits are neither controverted by contrary record evidence *nor impugned by bad faith on the part of the agency*.

*King v. Dep't of Justice*, 830 F.2d 210, 217 (D.C. Cir. 1987) (footnotes omitted) (emphasis added); a*ccord Morley v. CIA*, 508 F.3d 1108, 1116 (D.C. Cir.  2007); *see also Campbell v. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998) (reasons for finding a declaration insufficient include bad faith).  Evidence of bad faith "vitiate[s] the credit to which agency affidavits are ordinarily entitled." *McGehee v. CIA*, 697 F.2d 1095, 1113 (D.C. Cir. 1983).  "Where there is evidence of bad faith, the representations of the agency lose all trustworthiness." *Allen v. CIA*, 636 F.2d 1287, 1298 (D.C. Cir. 1980).

The Agency acted in bad faith by failing to conduct a search reasonably calculated to locate responsive documents, by improperly withholding documents, and by making knowingly false or misleading statements in its Declarations and District Court filings.  *See McGehee*, 697 F.2d at 1113 (bad faith evidenced by delays in processing request and failure to disclose relevant information regarding the processing of the request). The Agency's bad faith renders its Declarations unreliable, and summary judgment in its favor is improper for that reason alone.  *Id.,* 697 F.2d at 1102, n. 26 (court may conclude that agency has not met its burden under FOIA "solely on the ground that the credibility of the affidavit it submitted … is undermined by evidence of bad faith").

The Agency initially claimed to have located only two documents concerning inundation maps and Emergency Action Plans, and only after PEER's administrative appeal located a binder containing 77 drafts of inundation maps. The Agency made no attempt to explain how it is that an initial search failed to discover 77 inundation maps (which, after locating, it still withheld).[4]

Similarly, the Agency claimed that it did not know PEER's request for a November 2009 report issued by a panel of technical advisers was for a report that was actually dated October 2009, although the Agency's FOIA Office itself had cited the November 2009 date a few days earlier in claiming the Expert Report was exempt from disclosure to the *Brownsville Herald* newspaper. The very same document was contemporaneously identified on the Agency's website as a November 2009 Report.[5]

---

[4] PEER recognizes that under this Circuit's precedent, failure to locate documents on an initial search which are later located and disclosed cannot alone support a finding of bad faith. *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 645 (D.C. Cir. 2002). However, in the context of all of the other evidence of bad faith present here, the Agency's unexplained failure to locate 77 inundations maps and failure to release them after they were located can be considered to contribute to the overall picture of an agency responding to a FOIA request in bad faith.

[5] JA 81 and n.2, citing the Agency's website at http://www.ibwc.gov/Mission_Operations/SoD_Amistad.html:
> In June of 2008 the Commission selected and convened a panel of highly qualified "expert" consultants to work under the

Responding to these facts in its summary judgment briefing before the

District Court, the Agency blamed its "Safety Dams Section" for being

unaware of the November 2009 date on the Agency's website, and unaware

that the Agency had cited the November 2009 date a few days earlier in

claiming the Expert Report was exempt from disclosure.  JA 71.  However,

PEER presented evidence that it was not the Safety Dam Section that made

the false claim that the Expert Report did not exist; it was the FOIA office,

which had full knowledge of the above facts. JA 94.  In response, the

Agency made the outrageously false assertion that, "there is no FOIA office

as Plaintiff claims."  JA 108.  PEER in turn cited to the Agency's website,

where the "Chief FOIA Officer Report 2011" states:

> An update was provided to FOIA Office personnel in response
> to the President's memorandum and Attorney General's
> guidelines of March 19, 2009.  Policy regarding the
> presumption of openness is discussed with staff and FOIA

---

guidance of agency's Technical Advisors (USACE and
CONAGUA) to investigate and evaluate Amistad Dam. The
scope of work was written to include aspects of Dam Safety
with a primary focus on the embankment foundation in Mexico.
The "expert panel" (to include Technical Advisors of the
agency) made several site visits, and among other things
evaluated current and historical data and documentation, and
conducted a potential failure modes analysis for the dam. The
final consensus report and a project plan were developed and
finalized in November 2009.

Office personnel on a regular basis in the distribution of and responses to requests.[6]

Moreover, as detailed below, at 27, the Agency chose to withhold the Emergency Action Plans and inundation maps even though in another context it had previously agreed that they should be made public.

The Agency continued its bad faith false and misleading representations in its Declarations and filings submitted to the District Court. As detailed more fully below, the Agency submitted Declarations concerning a terrorist threat on Falcon Dam which it knew to be a rumor or hoax.  JA 56 at ¶ 6.  The Agency then used this fictional threat to support its claim of national security implications for release of withheld documents, raising the specter of "massive downstream casualties" in its Motion for Summary Judgment.  JA 75.  The Agency's *Vaughn* index,  JA 76, identified the authors of the Expert Report as the U.S. Army Corps of Engineers and the U.S. Bureau of Reclamation "for the USIBWC," omitting the fact, crucial to the Exemption 5 analysis, that CONAUGA, an agency of the Mexican government, also authored the Expert Report.

These facts demonstrate bad faith on the part of the Agency in responding to PEER's FOIA request and in defending its actions in court.

---

[6] JA 164, citing http://www.ibwc.state.gov/Files/FOIA _Annual_Report_FY11.pdf .

PEER also requests the Court to take judicial notice of additional

evidence of a continuous pattern of bad faith by the Agency in FOIA

responses to this requester.  In another FOIA case between the parties

herein, *Pub. Employees for Envtl. Responsibility v. U. S. Section, Int'l*

*Boundary And Water Comm'n, U.S. –Mex.,* 842 F. Supp. 2d 219 (D.D.C.

2012), the court found the Agency's Declarations to be inadequate and

concluded that, "The most charitable reading of the Commission's

interpretation [of PEER's FOIA request] was that it was reasonably

calculated to provide PEER with as few documents as possible," *id*. at 225,

and that the Agency "is simply persisting in blowing-off  PEER's FOIA

request." *Id.* at 226.

The Agency's Declarations are insufficient to support summary

judgment for an additional reason:  a key Declaration is impermissibly

qualified and not based on personal knowledge as required by Fed.R.Civ.P.

56(c)(4):

> An affidavit or declaration used to support or oppose a motion
> must be made on personal knowledge, set out facts that would
> be admissible in evidence, and show that the affiant or declarant
> is competent to testify on the matters stated.

The first Declaration of Steve Fitten, which is the primary Declaration

submitted by the Agency to support its action, setting forth the justifications

for the failure to locate documents in the initial search, as well as the

15

justifications for the withholdings and lack of segregability, JA 59, 60-62,

contains a declaration that it is "true and correct to the best of my knowledge

and belief."  Although a declaration so qualified may be sufficient for

purposes of 28 U.S.C. § 1746 alone, it is insufficient for purposes of Rule

56, because the "best of my knowledge and belief" does not rise to the level

of personal knowledge or competent, admissible testimony.  *See U.S. v. 8*

*Gilcrease Lane, Quincy Fla. 32351*, 587 F. Supp. 2d 133, 139 (D.D.C. 2008)

(citing *Cobell v. Norton*, 391 F.3d 251, 260 (D.C. Cir. 2004)).[7]

In sum, the Agency's demonstrated bad faith and impermissibly

qualified Declarations prevent their use to support summary judgment.

### III.    THE AGENCY HAS NOT MET ITS BURDEN TO JUSTIFY ITS WITHHOLDINGS PURSUANT TO EXEMPTIONS 5, 7(E) AND 7(F).

#### A. Exemption 7

The Agency invoked Exemption 7 to withhold major portions of two

Emergency Action Plans and the entirety of 77 dam failure inundation maps.

Exemption 7 of the FOIA protects "records or information compiled for law

---

[7]  A second Fitten Declaration, JA 154-55, included the same qualification and was not made under penalty of perjury.  By way of "Errata" submitted after close of briefing, JA 165-66 the Agency substituted for the second Fitten Declaration a "revised" version, JA 167-68, which removed the "knowledge and belief" language and added perjury language. The second Declaration covers different material from the First Declaration, which was never resubmitted in the required form.

enforcement purposes," but only to the extent that disclosure of those records would cause an enumerated harm.  5 U.S.C. § 552(b)(7).  Thus, an agency must meet the threshold requirement that the documents were compiled for law enforcement purposes and then also meet the requirement to show that disclosure would cause one of the harms enumerated in the subsections of Exemption 7.  Here, the Agency failed to meet the threshold requirement and also failed to demonstrate that disclosure would cause one of the enumerated harms.

### 1. The Agency Fails to Meet the Threshold Requirement of Exemption 7

An agency must first establish that the records were compiled for law enforcement purposes.  To make this showing, the courts require that an agency first demonstrate that it has law enforcement as its primary function, or at the least that it has some law enforcement authority.

> The threshold issue in any exemption (7) claim is whether the agency involved may properly be classified as a "law enforcement" agency. The term "law enforcement purpose" has been construed to require an examination of the agency itself to determine whether the agency may exercise a law enforcement function.

*Church of Scientology of Calif. v. U.S. Dep't of the Army*, 611 F.2d 738, 748 (9th Cir. 1979).

17

Once the agency has established a law enforcement function, it must also demonstrate that the documents in question were compiled for a law enforcement purpose within its jurisdiction. *Pratt* v. *Webster*, 673 F.2d 408, 414-16 (D.C. Cir. 1982); *see also Jefferson v. Dep't of Justice*, 284 F.3d 172, 177 (D.C. Cir. 2002); *Campbell*, 164 F.3d at 33 ("to justify summary judgment under exemption 7, the FBI must explain why each withheld document . . . relate[s] to a particular law enforcement purpose.").

In determining whether this second burden with regard to the particular documents is met, the courts apply a more deferential standard to agencies whose primary purpose is law enforcement, as opposed to those with both law enforcement and other functions. *Tax Analysts v. IRS*, 294 F.3d 71, 77 (D.C. Cir. 2002) (citing *Pratt* v. *Webster*, 673 F.2d at 418). While an agency whose primary function is law enforcement must establish only a "rational nexus" between the records it seeks to withhold and "its authority to enforce a statute or regulation," *Abdelfattah v. U.S. Dep't of Homeland Sec*., 488 F.3d 178, 186 (3d Cir. 2007), an agency with mixed functions is subject to a more "exacting standard" in showing the connection between the withheld documents and its law enforcement functions. *Tax Analysts,* 294 F.3d at 77. Such an agency "must demonstrate that it had a

18

purpose falling within its sphere of enforcement authority in compiling the particular document." *Church of Scientology,* 611 F.2d at 748.

Here, the Agency cannot even meet the initial requirement of having a law enforcement function. The Agency claimed no law enforcement function at all, nor could it, because it has none. Thus, the Agency cannot even reach the second part of the test as to whether the particular withheld documents were compiled for a law enforcement purpose within its jurisdiction. No Agency document could possibly have been compiled for a purpose falling within the Agency's sphere of enforcement authority, since it has none.

The Agency attempts to apply the "rational nexus" test to itself -- even though that test is applicable only to agencies whose primary function is law enforcement -- claiming that it has "a nexus with [the Department of Homeland Security] DHS (as well as other law enforcement agencies)." JA 106; *see also* JA 74. The Agency cites no authority supporting its novel claim that an agency without law enforcement authority can claim Exemption 7 because it has some connection with agencies which do have enforcement authority. The nexus approach seeks to determine the relationship between the withheld documents and the agency's law enforcement authority, not a nexus between an agency with no law

enforcement functions and another agency that has law enforcement authority.

Furthermore, even if, contrary to the requirement that an agency claiming Exemption 7 must have a law enforcement function, the exemption could apply because the withheld documents have a nexus to a different agency with law enforcement authority, the Agency has made no showing of how the inundation maps and Emergency Action Plans relate to the enforcement of any particular statute or regulation by DHS or other enforcement agencies. *See Patterson v. IRS*, 56 F.3d 832, 837 (7th Cir. 1995) (FOIA Declaration found inadequate because it failed to recite the statutes pursuant to which the agency purportedly conducted a law enforcement investigation). Rather, the Agency only asserts that the inundation maps and Emergency Action Plans would "assist" enforcement agencies in carrying out evacuation and emergency response in the event of dam failure. JA 61-62, ¶¶ 22, 23. The mere fact that evacuation and emergency response are carried out by agencies which have law enforcement functions does not mean that those particular activities constitute law enforcement, or thus that the documents in question were "compiled for law enforcement purposes."

20

*Living Rivers, Inc. v. Bureau of Reclamation*, 272 F. Supp. 2d 1313, 1319 (D. Utah 2003), approving the withholding of inundation maps for certain Bureau of Reclamation dams, is not to the contrary.  In any event, that case has not been followed by this Court.  There, citing 43 U.S.C. § 373b(a), the court found that Congress had provided the Bureau of Reclamation with express  "law enforcement authority" to "maintain law and order and protect person and property within Reclamation projects and on Reclamation lands."  *Id.* at 1319.  As detailed above, the existence of a law enforcement function is an essential prerequisite to the assertion of Exemption 7, and thus the *Living Rivers* court could not have upheld the exemption without it.  *See also Am. Civil Liberties Union v. Dept. of Defense*, 543 F.3d 59, 80-82 (2nd Cir. 2008), *vacated and remanded on other grounds,* 130 S. Ct. 779 (2007) (criticizing *Living Rivers'* application of Exemption 7(F) without "serious consideration to the scope of exemption 7(F); to what the government must do to meet its burden of establishing danger to 'any individual'; and to the lack of fit between an expansive reading of exemption 7(F) and FOIA's treatment of national security information").

Nor does a vague connection with "national security" provide the missing law enforcement purpose.  Even assuming that dams are terrorist

21

targets and the inundation maps and Emergency Action Plans could assist

terrorists, that would not mean that those documents were "compiled for law

enforcement purposes" within the meaning of Exemption 7.  *See Milner,* 131

S. Ct. at 1270-71 (even assuming release of information could undermine the

security of the Navy's stored weapons, Court cannot create a FOIA

exemption which has not been enacted by Congress).  Neither the District

Court nor the Agency has cited any case, and PEER has found none, where

Exemption 7 was applied simply because there was some national security

implication, when the documents were not connected to actual law

enforcement by an agency with law enforcement authority.  In accordance

with *Milner*, the fact that there is a national security connection cannot

exempt information from disclosure which does not qualify within the four

corners of a FOIA exemption.  As shown above and below, the withholdings

here do not meet the requirements of Exemption 7.

    In addition, the purported national security connection with the

inundation maps and Emergency Action Plans is greatly exaggerated, if not

non-existent.  The District Court relied specifically on the Fitten

Declarations alleging that the Agency had received warnings of terrorist

threats against the dams.  JA 32-33; JA 56, ¶6; JA 167-68, ¶¶3-4.  However,

PEER established that the Agency's dishonest Declarations were made with

full knowledge that the so-called terrorist threats they reported were known to be hoaxes, pointing to a contemporaneous news article with the poetic headline, "*False reports fuel fear of Zeta-led attack on Falcon Dam*" (hereinafter *False Reports*).[8]  PEER also exposed as false the Declarations' warnings of potentially massive casualties and property damage, JA 55, ¶4; JA 107, ¶¶ 2, 3, noting that the *False Reports* article quoted Agency officials and others discussing the very limited risk posed by any potential threat to the dam.  The article states:

> A complete failure of Falcon Dam, either by accident or an act of terrorism, would be extremely unlikely, said Sally Spener, spokeswoman for the International Boundary and Water Commission, the government body that oversees border water rights issues between the United States and Mexico. During such an event, the water would be diverted via the Anzalduas Dam near McAllen to off-river floodways that guide floodwaters toward the Gulf of Mexico, Spener said. Similar floodways exist on the Mexican side of the river.

JA 92.  The article goes on to describe local officials' similarly nonchalant attitude toward the possibility of an attack on the dam or dam failure:

> Gene Falcon, Starr County emergency management coordinator, said authorities' response when the dam fails would be similar to a major flood event, when additional water is allowed to pass over the dam.  Much of Starr County sits on higher ground than neighboring communities in Tamaulipas

---

[8] JA 91-92, citing Jared Taylor and Jeremy Roebuck, *False reports fuel fear of Zeta-led attack on Falcon Dam*, The Monitor, June 4, 2010, available at http://www.themonitor.com/articles/texas-48642-rangers-drug.html?db=monitortx&id=39450.

> state, where most of the water would flow, Falcon said. Still, some low-lying areas along arroyos that drain into the Rio Grande and areas along U.S. 83 would require evacuation. If an attack actually opened up the flood gates, Falcon said the county's plan remains the same: Notify affected residents immediately and move them to higher ground.

JA 93.

The lack of substance to any terrorist dangers stemming from public release of the inundation maps and Emergency Action Plans is also evidenced by the fact that among the nation's more than 100,000 dams, inundation maps and Emergency Action Plans for the largest and most hazardous are routinely posted on the internet, and federal agencies recognize the importance of making this information available to potentially affected communities.  PEER demonstrated that the Federal Emergency Management Agency (FEMA), for example, directs dam owners and operators to share Emergency Action Plans and inundation maps with downstream communities, to provide those communities with information they need to prepare for disaster, specifically including the risk of dam failure, whether from terrorists or neglect or natural causes.[9]

FEMA's emergency preparedness handbook for local communities states:

_____

[9] JA 84-85, citing Credit for Dam Safety, at 2 (2006) (available at http://www.fema.gov/library/viewRecord.do?fromSearch=fromsearch&id=4 612.

Emergency preparedness planning and emergency response take place at the community level. The first thing for the community to do is determine if there are dams upstream that would adversely affect the community if they failed. If there is a dam that would cause flooding in the community, the next step is to obtain the dam's EAP, if one exists.[10]

The appendix to the handbook emphasizes the critical nature of community access to the Emergency Action Plan:

It is virtually impossible for a community to properly prepare for a dam failure emergency without an EAP prepared by the dam owner. It should also be apparent that downstream communities should participate in the development of EAPs for all dams upstream from them. The communities certainly need to know that they are included in the dam owner's/operator's notification list. They should also be aware of the nature of the dam failures that are forecast and the assumptions used to develop them. Finally, the community should be sure that it always has the latest revision of the EAP.[11]

The appendix to the handbook likewise emphasizes the essential nature of community access to the inundation maps:

Maps showing the area that will be inundated are the final parts of the EAP that are essential to downstream emergency preparedness and response.[12]

The U. S. Army Corps of Engineers, the nation's preeminent builder, operator and expert on dams, also recognizes the importance of public

---

[10] Credit for Dam Safety at 7.

[11] *Id.* at A-1.

[12] *Id.* at A-5.

access to Emergency Action Plans and inundation maps. For example, the

Corps has posted online all of the inundation maps for Wolf Creek Dam in

Kentucky,[13] which impounds Lake Cumberland, the largest reservoir east of

the Mississippi River and ninth largest in the U.S.[14]

The Corps has taken the same approach in other areas, as evidenced

by this news report from Bakersfield, California.

> While repair work continues on the Lake Isabella Dam, the U.S.
> Army Corps of Engineers and the Kern County Fire
> Department are busy planning for worst-case scenarios should
> the dam ever fail. After months of waiting, the Kern County
> Board of Supervisors finally got its wish Tuesday morning of
> getting new flood inundation maps of the Bakersfield area if the
> Lake Isabella dam were to rupture. The maps were created
> using GPS technology and will be used to help chart emergency
> evacuation plans.
>
> Kern County Fire Chief Dennis Thompson said officials the
> maps, made by the Army Corps of Engineers, should bring the
> public further awareness were the unlikelihood of a flood were
> to occur. Specifically, officials said that when it comes to how
> long it would take for floodwater to reach homes, schools or
> businesses. The maps also indicate how deep such water could
> be and at what speed it would flow. [Errors or omissions as in
> original.]
>
> *The public can get a very detailed look at all that information
> for a given neighborhood and even a specific street.* The board

---

[13] JA 86-87, citing
http://www.lrn.usace.army.mil/WolfCreek/maps_online.htm, where the
maps are online.

[14] JA 87, citing http://gisweb.apsu.edu/WolfCreek.html.

requested the information be posted months ago. Officials said the information would help if such a disaster strikes.[15]

Internet posting of inundation maps is common practice in California. Dam Inundation maps for the State of California are required by California Government Code Section 8589.5(b). Dam inundation maps showing the maximum extent of damage of a flood wave emanating from a dam failure are widely available for viewing online.[16]

In fact, non-law enforcement agencies and individuals have long had access to much of the information the Agency now claims is exempt because it could aid terrorists. As PEER argued below:

> The Rio Grande Institute, a private, nonprofit group that is located in Rio Grande Valley, has worked closely with the USIBWC, local officials, and the general public for over ten years on a comprehensive disaster mitigation plan. The Plan has been approved by FEMA and the State of Texas, and calls for making all of the EAPs and inundation maps fully available to the general public.[17]

---

[15] JA 86-87, citing Bakersfield News KERO23, Lake Isabella Flood Maps Released, POSTED: 9:16 am PDT April 8, 2008, available at http://www.turnto23.com/news/15824853/detail.html (emphasis supplied).

[16] JA 88, citing *e.g.* http://www.water.ca.gov/orovillerelicensing/docs/wg_study_reports_and_docs/EO/SP-E4%20App%20B.pdf.

[17] JA 89-90, citing, The Rio Grande Institute, Status of the Transboundary Risk Identification and Mitigation System (TRIMS) Project, at 5, July 17, 2010, available at http://riogrande.org/2010/07/19/alex-update-on-need-for-trims/

In sum, the Agency has not and cannot meet the threshold requirement for Exemption 7 because it has no law enforcement functions. Even if it could somehow bootstrap the law enforcement functions of other agencies with which it cooperates, there is no showing that the withheld documents were compiled for law enforcement purposes. While not relevant to the question of whether a FOIA exemption applies, ample available evidence contradicts the Agency's claim that disclosure could aid terrorists.

## 2. **Exemption 7(E) Does Not Apply Here**

As explained above, to support withholding, an agency must both meet the threshold requirement of Exemption 7 and demonstrate that one of the enumerated harms exists. The Agency has not met the threshold requirement, and therefore the Exemption does not apply. In addition, the Agency has failed to demonstrate that the claimed enumerated harms are present. The Agency withheld portions of the Emergency Action Plans pursuant to Exemption 7(E), which protects information compiled for law enforcement purposes when release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

28

The District Court upheld the Agency's claim under 7(E) because "the Falcon and Amistad Dams are considered possible terrorist threats" and the Emergency Action Plans contain guidelines and procedures for an emergency such as a terrorist attack.  JA 37-38.  However, neither the District Court nor the Agency explained how the withheld material relates to "law enforcement investigations or prosecutions" whose techniques, procedures or guidelines disclosure could reveal.  There is nothing in the record to support a claim that the Emergency Action Plans contain any techniques, procedures or guidelines for law enforcement investigations or prosecutions.  *See Families for Freedom v. U.S. Customs & Border Prot*., 797 F. Supp. 2d 375, 391-93 (S.D.N.Y.  2011) (rejecting Exemption 7(E) claim without need to reach question of risk of circumvention of the law because arrest statistics were "neither 'techniques or procedures' nor 'guidelines;'" fact that subject matter fell under the broad topic of national security not enough to claim the exemption).

Although it is not necessary to reach the question of the risk of circumvention of the law, since the documents do not concern law enforcement investigations or prosecutions, the Agency also has not shown how release of the documents would "risk circumvention of the law."  Under (7)(E), the agency is required to "demonstrate logically how the release of

29

the requested information might create a risk of circumvention of the law."

*Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (quoting *Mayer Brown*

*LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009)).

Thus, even if the Agency had met the threshold requirement of

Exemption 7, it did not meet the additional requirement for an enumerated

harm with regard to the Emergency Action Plans.

### 3. Exemption 7(F) Does Not Apply Here

The Agency invoked Exemption 7(F) to withhold all of the inundation

maps as well as portions of the Emergency Action Plans.  Exemption 7(F)

allows withholding of records or information compiled for law enforcement

purposes, the disclosure of which "could reasonably be expected to endanger

the life or physical safety of any individual."  5 U.S.C. § 552(b)(7)(F).

However, the Agency has failed to identify "any individual" whose life or

safety would be endangered.

> To construe the word 'any' to relieve the government of the
> burden of identifying an individual who could reasonably be
> expected to be endangered would be to read 'individual' out of
> the exemption. In effect, it would convert the phrase 'endanger
> the life or physical safety of any individual' into 'endanger life
> or physical safety.'

*Am. Civil Liberties Union,* 543 F.3d at 70.  *Living Rivers* is one of few cases

to do away with this requirement, and its rationale was convincingly rejected

by the Second Circuit in *Am. Civil Liberties Union,* 543 F.3d at 80-82.

30

Even if one were to assume that the Agency had implicitly identified as endangered all of the individuals who might be impacted by failure of the Agency's dams, as detailed above, at 23, the Agency has publically disclaimed the possibility that dam failure would cause a threat to the life or safety of anyone.  Moreover, the Agency's attenuated logic that access to the inundation maps and Emergency Action Plans might allow terrorists to better plan an attack, and therefore make such an attack more likely and more damaging, and therefore threaten the life or safety of individuals, hardly amounts to a "reasonable expectation" that this would occur.  As discussed above, at 24-27, federal and state government agencies in charge of homeland security and dam safety encourage and facilitate the public availability of Emergency Action Plans and inundation maps.  This calls into serious question any claim that making the maps public endangers the life or safety of any individual, rather than instead protecting life and safety by giving community members information needed for emergency planning.

Thus, even if the Agency had met the threshold requirement of Exemption 7, it did not meet the additional requirement for an enumerated harm with regard to the Emergency Action Plans and inundation maps pursuant to Exempt 7(F).

31

## B. Exemption 5 Is Not Met Because the Expert Report Is Not Intra- or Inter-Agency or Deliberative

Pursuant to Exemption 5, the Agency withheld the Expert Report.

Exemption 5 protects "inter-agency or intra-agency memorandums or letters

which would not be available by law to a party . . . in litigation with the

agency." 5 U.S.C. § 552(b)(5).  It incorporates the "deliberative process

privilege," under which the document must be both inter- or intra-agency

and deliberative.  *See Williams & Connolly v. SEC*, 662 F.3d 1240, 1243

(D.C. Cir. 2011).  The Expert Report does not qualify for Exemption 5

because is not inter-agency or intra-agency and it is not deliberative.  In

addition, the Agency failed to segregate non-exempt, factual material.

### 1. The Expert Report Is Neither Inter-agency nor Intra-agency.

The Agency made a misleading representation that the Expert Report

was authored by employees of the U.S. Army Corps of Engineers and the

U.S. Bureau of Reclamation.  JA 76.  However, the technical advisors who

drafted the report also included representatives of the Mexican National

Water Commission ("CONAGUA").  This omitted fact is crucial to the

Exemption 5 analysis.  The Agency argues for the application of the

"consultant corollary" to Exemption 5, allowing a document to be

considered intra- or inter-agency even though prepared by persons outside

the agency.  It is applicable where outside consultants play essentially the same part in an agency's deliberative process as when documents are prepared by agency personnel.  *See Dep't of the Interior. v. Klamath Waters Users Protective Ass'n*, 532 U.S. 1 (2001).  However, the Supreme Court held that the consultant corollary applies only where the outside consultant

> does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it. Its only obligations are to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do.

*Klamath*, 532 U.S. at 11.

  CONAUGA cannot fit this definition, since it is an agent of a foreign government, charged with serving the national, financial and water interests of Mexico.  It certainly was not functioning as the equivalent of an employee of the Agency.  In the *Klamath* case, the Supreme Court found that an American Indian tribe that provided technical water information to the Bureau of Indian Affairs – which acts pursuant to a trust responsibility for the tribe – did not meet the test for the "consultant corollary."  The case against CONAUGA is far stronger since it is an agent of a foreign government with its own distinct interests.

## 2. The Expert Report Is Not Deliberative.

To invoke the deliberative process exemption, an agency must establish what deliberative process is involved and the role played by the documents at issue in the course of that process. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980). The documents must "make[] recommendations or express[] opinions on legal or policy matters." *Vaughn v. Rosen*, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975). The agency must demonstrate specific harm to the decision-making process. *Mead Data Central v. Dep't of Air Force*, 566 F.2d 242, 258 (D.C. Cir. 1977).

Here, the Agency failed to meet its burden to support the exemption with regard to the Expert Report because it did not explain what decision-making process the document was part of, how it made recommendations or expressed opinions on legal or policy matters, or how its disclosure could harm the agency decision-making process. The only decision-making process referenced by the agency is deliberations on the Amistad Dam's safety classification. JA 59-60, ¶ 18. However, the material in the report clearly went beyond the matter of the safety classification to provide information about the greatest potential risks in the dam's foundation and embankments, risk reduction measures and consequences of inaction on recommendations. *Id.*; JA 76. There is no decision-making process

34

identified with regard to these matters.  With regard to recommendations on legal or policy matters and the harm to the decision-making process from release of the Expert Report, the Agency supplied no evidence or argument at all.

The Expert Report is also not deliberative because, as one would expect of a report by technical advisors on matters such as the condition of the embankment and concrete structure of a dam, recommendations for risk reduction measures and consequences of inaction, JA 76, it is likely largely factual.[18]  Factual material cannot be withheld under Exemption 5.  *EPA v. Mink*, 410 U.S. 73, 89 (1973); *Coastal States*, 617 F.2d at 867 (citing *Mink*, 410 U.S. 73).

Finally with regard to the Expert Report, the Agency itself reported that that the Expert Report itself had been implemented, thus negating any possible "deliberative" character.  Even if a document is "predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public."  *Coastal States*, 617 F.2d at 866.  *See also NLRB*

---

[18] A previous "Joint Report of the Technical Advisers" (April 2007), although limited in scope, nevertheless includes much purely factual information, such as reporting the condition of various components of the dam, when repairs had taken place, dam safety assessments by U.S. Army Corps of Engineers and the potential for loss of life and economic damages. *See* http://www.ibwc.state.gov/Files/SOD_Report_Amistad.pdf.

*v. Sears, Roebuck & Co.*, 421 U.S. 132, 151-2, 161 (1975); *American Soc. of Pension Actuaries v. IRS*, 746 F. Supp. 188, 192 (D.D.C. 1990) (ordering disclosure on the basis that the IRS's budget assumptions and calculations were "relied upon by the government" in making its final estimate for the President's budget).

Here, the Agency's website states that the Expert Report resulted in a final report and project plan that was then implemented by the Agency. "The final consensus report and a project plan were developed and finalized in November 2009 …. The agency initiated the implementation of several elements recommended in the consensus report…"[19]

## C.  The Agency Failed to Segregate Non-Exempt Material

FOIA mandates "any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  "The focus of the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead Data,* 566 F.2d at 260.  More specifically, "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions."  *Krikorian v. Dep't of State*, 984 F.2d 461, 466 (D.C. Cir.

---

[19] JA 95, quoting
http://www.ibwc.gov/Mission_Operations/SoD_Amistad.html.

1993) (quoting *Mead Data*, 566 F.2d at 260). The burden of demonstrating

that withheld documents contain no reasonably segregable exempt

information lies on the agency and not the party seeking the documents.

*Army Times Pub. Co. v. Dep't of Air Force*, 998 F.2d 1067, 1068 (D.C. Cir.

1993).

The agency must provide a "detailed justification" and not just

"conclusory statements" to demonstrate that it has released all reasonably

segregable information. *Mead Data*, 566 F.2d at 261. This detailed

justification must "specifically identify[] the reasons why a particular

exemption is relevant and correlat[e] those claims with the particular part of

a withheld document to which they apply." *Id.* at 251.

> [U]nless the segregability provision of the FOIA is to be
> nothing more than a precatory precept, agencies must be
> required to provide the reasons behind their conclusions in
> order that they may be challenged by FOIA plaintiffs and
> reviewed by the courts.
>
> In addition to a statement of its reasons, an agency should also
> describe what proportion of the information in a document is
> non-exempt and how that material is dispersed throughout the
> document.

*Id.* at 261. *See also McGehee v. U. S. Dep't of Justice*, 800 F. Supp. 2d 220,

238 (D.D.C. 2011) ("Defendant's declarant's statement that '[e]very effort

was made to provide plaintiff with all material in the public domain and with

all reasonably segregable portions of the releasable material' falls far short

of the specificity required to justify non-segregation") (citations omitted);

*Carter, Fullerton & Hayes, LLC v. FTC*, 520 F. Supp. 2d 134, 148 (D.D.C.

2007) (holding insufficient generic declaration that deliberative and factual

content is inextricably intertwined).

　　　Here, the Agency's claim to have released all segregable information

rests solely on the Fitten Declaration.  Mr. Fitten simply asserts that "the

USIBWC has evaluated all responsive documents to determine if any

information could be segregated and released," and specifically with regard

to the Expert Report, that "any non-exempt portions . . . [were] inextricably

intertwined with exempt portions."  JA 62, ¶24].  This Declaration falls far

short of this Court's standard, and in fact is exactly the type of "conclusory

statement" that courts in this Circuit have rejected.

　　　Perhaps realizing the weakness of its segregability claim, the Agency

contended in its motion for summary affirmance that in its summary

judgment briefing, PEER had not directly challenged the Agency's argument

that it properly disclosed all reasonably segregable, non-exempt information,

thereby waiving the claim.

　　　This is not the case.  PEER did raise the issue.  *See, e.g.*, JA 6, ¶ 19

(Allegation in Complaint that the Agency made no apparent attempt to

segregate exempt from non-exempt portions of the material); JA5, ¶ 5

(allegation in complaint that deliberative process privilege is inapplicable to purely factual matters, which must be segregated out and released); JA 96-97 (argument in summary judgment memo that factual portions of otherwise deliberative documents must be disclosed).

More important, even if PEER had not raised the issue, the court had an affirmative duty to consider the segregability issue sua sponte. *Morley*, 508 F.3d at 1123. "[I]f the district court approves withholding without such a finding, remand is required even if the requestee did not raise the issue of segregability before the court." *Stolt-Nielsen Transp. Group LTD. v. U.S.,* 534 F.3d 728, 734 (D.C. Cir. 2008) (citing *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007); *Johnson v. Exec. Office for United States Attys.*, 310 F.3d 77, 776 (D.C. Cir. 2002)). Therefore, the issue is not one that can be waived.

The District Court did consider the issue, finding that "USIBWC has discharged its burden of showing with reasonable specificity why documents could not be further segregated." JA40.

In sum, this issue was ruled upon and is properly before this Court. The Agency has failed to meet its burden to show that it released all segregable non-exempt information.

## CONCLUSION

For the foregoing reasons, PEER respectfully requests that this Court reverse the decision of the U.S. District Court for the District of Columbia granting summary judgment to the Agency and denying summary judgment to PEER, and order the release to PEER of all documents withheld by the Agency under claims of exemption from FOIA.

Respectfully submitted,

/s/ Paula Dinerstein
Paula Dinerstein
Public Employees for Environmental
Responsibility
2000 P Street, NW Suite 240
Washington, D.C. 20036
(202) 265-7337

Counsel for Appellant PEER

**STATUTORY ADDENDUM**
**FREEDOM OF INFORMATION ACT**
(relevant portions)

### 5 U.S.C. § 552. Public information; agency rules, opinions, orders, records, and proceedings

**(a)** Each agency shall make available to the public information as follows:

….

**(3) (A)** Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

**(B)** In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

**(C)** In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system.

**(D)** For purposes of this paragraph, the term "search" means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.

….

**(4)(B)** On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

**(C)** Notwithstanding any other provision of law, the defendant shall serve an

answer or otherwise plead to any complaint made under this subsection within thirty days after service upon the defendant of the pleading in which such complaint is made, unless the court otherwise directs for good cause shown.

**(D)** [Repealed]

**(E) (i)** The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.

**(ii)** For purposes of this subparagraph, a complainant has substantially prevailed if the complainant has obtained relief through either--

**(I)** a judicial order, or an enforceable written agreement or consent decree; or

**(II)** a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

**(F) (i)** Whenever the court orders the production of any agency records improperly withheld from the complainant and assesses against the United States reasonable attorney fees and other litigation costs, and the court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, the Special Counsel shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding. The Special Counsel, after investigation and consideration of the evidence submitted, shall submit his findings and recommendations to the administrative authority of the agency concerned and shall send copies of the findings and recommendations to the officer or employee or his representative. The administrative authority shall take the corrective action that the Special Counsel recommends.

**(ii)** The Attorney General shall--

**(I)** notify the Special Counsel of each civil action described under the first sentence of clause (i); and

**(II)** annually submit a report to Congress on the number of such civil actions in the preceding year.

**(iii)** The Special Counsel shall annually submit a report to Congress on the actions taken by the Special Counsel under clause (i).

**(G)** In the event of noncompliance with the order of the court, the district court may punish for contempt the responsible employee, and in the case of a uniformed service, the responsible member.

**....**

**(6) (A)** Each agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall--

**(i)** determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination; and

**(ii)** make a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal. If on appeal the denial of the request for records is in whole or in part upheld, the agency shall notify the person making such request of the provisions for judicial review of that determination under paragraph (4) of this subsection.

The 20-day period under clause (i) shall commence on the date on which the request is first received by the appropriate component of the agency, but in any event not later than ten days after the request is first received by any component of the agency that is designated in the agency's regulations under this section to receive requests under this section. The 20-day period shall not be tolled by the agency except--

**(I)** that the agency may make one request to the requester for information and toll the 20-day period while it is awaiting such information that it has reasonably requested from the requester under this section; or

**(II)** if necessary to clarify with the requester issues regarding fee assessment. In either case, the agency's receipt of the requester's response to the agency's request for information or clarification ends the tolling period.

**(B) (i)** In unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of subparagraph (A) may be extended by written notice to the person making such request setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days, except as provided in clause (ii) of this subparagraph.

**(ii)** With respect to a request for which a written notice under clause (i) extends the time limits prescribed under clause (i) of subparagraph (A), the agency shall notify the person making the request if the request cannot be processed within the time limit specified in that clause and shall provide the person an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request. To aid the requester, each agency shall make available its FOIA Public

3

Liaison, who shall assist in the resolution of any disputes between the requester and the agency. Refusal by the person to reasonably modify the request or arrange such an alternative time frame shall be considered as a factor in determining whether exceptional circumstances exist for purposes of subparagraph (C).

**(iii)** As used in this subparagraph, "unusual circumstances" means, but only to the extent reasonably necessary to the proper processing of the particular requests--

**(I)** the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;

**(II)** the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or

**(III)** the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein.

**(iv)** Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for the aggregation of certain requests by the same requestor, or by a group of requestors acting in concert, if the agency reasonably believes that such requests actually constitute a single request, which would otherwise satisfy the unusual circumstances specified in this subparagraph, and the requests involve clearly related matters. Multiple requests involving unrelated matters shall not be aggregated.

**(C) (i)** Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph. If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records. Upon any determination by an agency to comply with a request for records, the records shall be made promptly available to such person making such request. Any notification of denial of any request for records under this subsection shall set forth the names and titles or positions of each person responsible for the denial of such request.

(ii) For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable

4

progress in reducing its backlog of pending requests.

(iii) Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

….

**(b)** This section does not apply to matters that are--

**(1) (A)** specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and **(B)** are in fact properly classified pursuant to such Executive order;

**(2)** related solely to the internal personnel rules and practices of an agency;

**(3)** specifically exempted from disclosure by statute (other than section 552b of this title [5 USCS § 552b]), if that statute--

**(A) (i)** requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

**(ii)** establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

**(B)** if enacted after the date of enactment of the OPEN FOIA Act of 2009 [enacted Oct. 28, 2009], specifically cites to this paragraph.

**(4)** trade secrets and commercial or financial information obtained from a person and privileged or confidential;

**(5)** inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

**(6)** personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

**(7)** records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information **(A)** could reasonably be expected to interfere with enforcement proceedings, **(B)** would deprive a person of a right to a fair trial or an impartial adjudication, **(C)** could reasonably be expected to constitute an unwarranted invasion of personal privacy, **(D)** could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished

information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (**E**) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (**F**) could reasonably be expected to endanger the life or physical safety of any individual;

(**8**) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(**9**) geological or geophysical information and data, including maps, concerning wells.

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

….

(**f**) For purposes of this section, the term--

(**1**) "agency" as defined in section 551(1) of this title [5 USCS § 551(1)] includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency; and

(**2**) "record" and any other term used in this section in reference to information includes--

(**A**) any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format; and

(**B**) any information described under subparagraph (A) that is maintained for

an agency by an entity under Government contract, for the purposes of records management.

….

**j)** Each agency shall designate a Chief FOIA Officer who shall be a senior official of such agency (at the Assistant Secretary or equivalent level).

**(k)** The Chief FOIA Officer of each agency shall, subject to the authority of the head of the agency—

**(1)** have agency-wide responsibility for efficient and appropriate compliance with this section;

**(2)** monitor implementation of this section throughout the agency and keep the head of the agency, the chief legal officer of the agency, and the Attorney General appropriately informed of the agency's performance in implementing this section;

**(3)** recommend to the head of the agency such adjustments to agency practices, policies, personnel, and funding as may be necessary to improve its implementation of this section;

**(4)** review and report to the Attorney General, through the head of the agency, at such times and in such formats as the Attorney General may direct, on the agency's performance in implementing this section;

**(5)** facilitate public understanding of the purposes of the statutory exemptions of this section by including concise descriptions of the exemptions in both the agency's handbook issued under subsection (g), and the agency's annual report on this section, and by providing an overview, where appropriate, of certain general categories of agency records to which those exemptions apply; and

**(6)** designate one or more FOIA Public Liaisons.

**(l)** FOIA Public Liaisons shall report to the agency Chief FOIA Officer and shall serve as supervisory officials to whom a requester under this section can raise concerns about the service the requester has received from the FOIA Requester Center, following an initial response from the FOIA Requester Center Staff. FOIA Public Liaisons shall be responsible for assisting in reducing delays, increasing transparency and understanding of the status of requests, and assisting in the resolution of disputes.

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 8,620 words based upon the information calculated by Microsoft Word 2010, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii). Therefore, it complies with Rule 32(a)(7) of the Federal Rules of Appellate Procedure and Circuit Rule 32 of the United States Court of Appeals for the District of Columbia Circuit.

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word 2010, 14 point Times New Roman font.

Dated this 22nd day of January 2013.

/s/ Paula Dinerstein
Paula Dinerstein
Public Employees For
Environmental Responsibility
+            Attorneys for Appellant

## CERTIFICATE OF SERVICE

I hereby certify the two copies of the foregoing Brief of Appellant, Public

Employees for Environmental Responsibility and one copy of the Joint

Appendix were served upon the following by priority mail this 22nd day of

January 2013, in addition to the service by electronic filing.


Jane M. Lyons
R. Craig Lawrence
Assistant United States Attorneys
United States Attorney's Office for the District of Columbia
555 Fourth Street, N.W.
Washington, D.C. 20001


<u>/s/ Paula Dinerstein</u>
Paula Dinerstein